**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Fairview Development Corporation, et al.,)       No. CV-07-0337-PHX-SMM
                                         )
                                         )       **ORDER**
            Plaintiffs,                  )
                                         )
v.                                       )
                                         )
Aztex Custom Homebuilders, LLC, et al.,)
                                         )
            Defendants.                  )
                                         )
                                         )
_____)

Before the Court is a motion for summary judgment filed by Defendants Aztex Custom Homebuilders, LLC ("Aztex"), David Schmid, and Jane Doe Schmid (Dkt. 78). Plaintiffs Fairview Development Corporation ("Fairview"), David Katzin, and Christa Petracca filed a Response (Dkt. 87), Defendants filed a Reply (Dkt. 94), and the matter is now fully briefed.[1]

**BACKGROUND**

Pursuant to 17 U.S.C. § 101 *et seq.*, Plaintiffs brought a claim against Defendants for copyright infringement of a custom home's architectural plans, seeking damages, a permanent injunction, and attorneys' fees.

_____

[1] Defendants requested oral argument in connection with their Motion for Summary Judgment (Dkt. 78). The parties have had the opportunity to submit evidence and briefing. Accordingly, the Court finds the pending motion for summary judgment suitable for decision without oral argument and Defendants' request is denied. See LRCiv 7.2(f), 56.2.

In 2001, David Katzin, Christa Petracca, and Fairview formed a joint venture for the development of a 9,000-plus square foot custom home on property located in Paradise Valley, Arizona (Second Am. Compl. ¶ 6; Dkt. 88, Pl.'s Statement of Facts ("PSOF") ¶ 86). According to Plaintiffs, Fairview provided a sketch of the custom home design to architect Mark Seidner (PSOF ¶ 87). Seidner then "transformed the sketch into the working construction documents that became the Plans" (Id.). Katzin and Petracca, who were married at the time, paid Seidner over $25,000 for his services (Id. ¶ 88). Pursuant to the Joint Venture Agreement, any ownership and copyright of the architectural plans by the joint venture vested in Fairview (Id.).

When Katzin and Petracca underwent a divorce, they decided to sell the property before any construction took place (Id. ¶ 89). David Schmid is an experienced real estate developer with over twenty years of experience, and he is familiar with the Town of Paradise Valley's plan review and approval requirements (Id. ¶ 90). In April 2005, Schmid signed a $1.2 million contract to buy the property (Id. ¶ 91). Then, the joint venture offered to sell the architectural plans to Schmid for an additional $50,000 (Id. ¶ 92). Schmid declined to purchase the plans from the joint venture (Id. ¶ 94). According to Defendants, Schmid declined to do so in part because he believed only the architect could sell the rights to use them (Dkt. 79, Defs.' Statement of Facts ("DSOF") ¶ 15). Shortly thereafter, Schmid met with Seidner to discuss the architectural plans (PSOF ¶ 95). Schmid advised Seidner that he was buying the property (Id.). Later, Schmid provided a copy of the purchase contract for the property to Seidner (Id.).

Schmid next communicated with Seidner through a May 4, 2005 letter (DSOF ¶ 17). In exchange for $2,500, Schmid asked Seidner to write a letter to the Town of Paradise Valley (Id.). Schmid stated to Seidner, "I would like to use the Katzin plans. The Town of Paradise Valley requires a letter from you, authorizing use of the calculations and plans, before they will issue a building permit to me" (Id. ¶ 17). Schmid never told Seidner about Fairview's claim of ownership over the plans or the joint venture's offer to sell the plans for $50,000 (PSOF ¶ 95). On May 10, 2005, Seidner wrote the letter that Schmid requested (Id.

¶ 96).  Schmid later assigned the property to Aztex, who ultimately constructed the custom home depicted in the architectural plans (Id. ¶ 98).

A year later on or about April 19, 2006, Petracca contacted Seidner (DSOF ¶ 43).  She informed Seidner that Schmid/Aztex had not purchased the rights to use the architectural plans from Fairview (PSOF ¶ 30).  On April 21, 2006, Seidner wrote a letter to Petracca declaring that he rescinded his authorization to use the architectural plans (DSOF ¶ 46).

In August 2006, Seidner received an envelope from Five Star Development, which Seidner associated with Schmid (Id. ¶ 62).  Seidner returned the unopened envelope by letter dated August 9, 2006 (Id.).  In the letter, Seidner informed Schmid of his rescission (Id.).  On August 10, 2006, Seidner transferred "all ownership and use rights" in the architectural plans to Fairview (Id. ¶ 64).  On November 13, 2006, Fairview registered the copyright (Id. ¶ 76).  On February 14, 2007, Plaintiffs filed this lawsuit (Dkt. 1).

## STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive law determines which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  The dispute must also be genuine.  That is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."  Celotex, 477 U.S. at 323-24.  Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323-24. The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324. However, the nonmovant "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

## DISCUSSION

Defendants move for summary judgment on three issues: (1) that Defendants are not liable for copyright infringement, (2) that Plaintiffs David Katzin and Christine Petracca are not proper Plaintiffs, and (3) that Plaintiffs cannot recover any statutory damages or attorneys' fees. Plaintiffs only contest the first issue. In addition, Defendants assert that Plaintiffs failed to serve Jane Doe Schmid so that this Court lacks personal jurisdiction over her.

## I.    **Plaintiffs' Failure to Serve Jane Doe Schmid**

In order for a federal court to assert personal jurisdiction over a defendant, the defendant must be served in accordance with Rule 4 of the Federal Rules of Civil Procedure. Jackson v. Hayakawa, 682 F.2d 1344, 1347 (9th Cir. 1982). "Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." United Food & Commercial Workers Union, Locals 197, 373, 428, 588, 775, 839, 870, 1119, 1179, and 1532 v. Alpha Beta Co., 736 F.2d 1371, 1382 (9th Cir.1984). However, neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction without "substantial compliance with Rule 4." Jackson, 682 F.2d at 1347. If a defendant enters a general appearance or responsive pleading that fails to dispute personal jurisdiction, though, the defendant waives any defect in service or personal jurisdiction. Benny v. Pipes, 799 F.2d 489, 492 (9th Cir. 1986) (citing id.; Fed. R. Civ. P. 12(h)(1)).

1      With regards to fictitious defendants, generally the Ninth Circuit looks upon the use

2  of John Doe or Jane Doe defendants with disfavor.  Gillespie v. Civiletti, 629 F.2d 637, 642

3  (9th Cir. 1980); see Molnar v. Nat'l Broadcasting Co., 231 F.2d 684, 687 (9th Cir. 1956);

4  Wiltsie v. Cal. Dep't of Corr., 406 F.2d 515, 518 (9th Cir. 1968).  Under the Federal Rules

5  of Civil Procedure, there is no authority for the joining of fictitious defendants in an action

6  under a federal statute.  Molnar, 231 F.2d at 687.  Furthermore, in certain circumstances, a

7  plaintiff may file an amended complaint naming the defendant once he discovers the

8  defendant's identity through discovery.  See id.; see also Gillespie , 629 F.2d at 642.

9      Defendants assert that Plaintiffs did not properly serve Jane Doe Schmid, which they

10  also asserted in their Answer to the Second Amended Complaint (Dkt. 78, Def.'s Mot. For

11  Summ. J. 10:20-24; Dkt. 48, ¶ 41).  Therefore, Defendants assert that this Court lacks

12  personal jurisdiction over Jane Doe Schmid (Dkt. 78, 10: 20-24).  In response, Plaintiffs

13  assert that although they may have only served one copy of the lawsuit on David Schmid, this

14  service is also proper on Jane Doe Schmid because David is a resident of her home (Dkt. 87,

15  Pl.'s Resp. 16:8-18).  Furthermore, Plaintiffs argue that Defendants filed a general

16  appearance Answer on March 9, 2007 (Id. at 16:19-17:1).  In the Answer, Plaintiffs contend

17  that Jane Doe Schmid did not dispute personal jurisdiction so that her objection is waived

18  (Id.).  Defendants only asserted in their Answer that "service of process was not properly

19  made upon Jane Doe Schmid" (Dkt. 48, ¶ 41).  Without addressing whether service was valid

20  or waived, the Court will dismiss the fictitious defendant, Jane Doe Schmid, due to the Ninth

21  Circuit's disfavor of fictitious defendants.  Furthermore, Plaintiffs have discovered the

22  identity of David Schmid's wife, Patricia Schmid (PSOF ¶ 99).  Therefore, Plaintiffs could

23  have sought to amend their Complaint.

24  **II.    Plaintiffs' Entitlement to Statutory Damages and Attorneys' Fees**

25      Under the Federal Copyright Act, a copyright infringer is liable for either the

26  copyright owner's actual damages and any additional profits of the infringer, or statutory

27  damages.  17 U.S.C. § 504(a).  Registration is a prerequisite to certain remedies for

28  infringement.  When the copyright infringement of an unpublished work began before

registration, Section 412 denies any award of statutory damages or attorney's fees.  See 17 U.S.C. § 412.  However, a copyright owner whose work has been infringed upon before registration is entitled to the remedies ordinarily available in infringement cases, including an injunction and actual damages, plus any applicable profits not used as a measure of damages.  Id. (Notes of H. Comm. on the Judiciary, H.R. Rep. No. 94-1476 (1976)).

First, Plaintiffs concede that Fairview is the only appropriate Plaintiff (Dkt. 87, 17:5-6).  Plaintiffs David Katzin and Christa Petracca acknowledge that under the terms of their Joint Venture Agreement, "all ownership rights to those Plans vest with Fairview" (Dkt. 79, Joint Venture Agreement, Ex. to Ex. B, Dep. of David Katzin).  Currently, Plaintiff Fairview is the sole owner of the registered copyright.  Therefore, Plaintiffs David Katzin and Christa Petracca do not have copyright ownership rights or protection, and they are not entitled to relief.  As such, summary judgment in favor of Defendants will be granted as to David Katzin's and Christa Petracca's claims.

Second, Plaintiffs[2] also concede that statutory damages and attorneys' fees are not available to Plaintiff Fairview under 17 U.S.C. §§ 504-05 (Dkt. 87, 17:6-9).[3]  Fairview did not register the copyright until November 13, 2006, which is after the alleged infringement occurred (DSOF ¶ 76).  Therefore, Fairview is not entitled to any statutory damages or attorneys' fees under the statute.  Summary judgment in favor of Defendants will be granted as to Plaintiff Fairview's claim for statutory damages and attorneys' fees.

## III.   Copyright Infringement

It is well established that architectural plans and drawings are entitled to copyright protection under the Federal Copyright Act.  17 U.S.C. § 101 et seq.  Section § 101 specifically defines an "architectural work" as "the design of a building as embodied in any

---

[2] Hereinafter, the Court will only refer to Plaintiff Fairview ("Plaintiff") as summary judgment has been granted against Plaintiffs David Katzin and Christa Petracca.

[3] In light of Rule 11 of the Federal Rules of Civil Procedure, the Court questions why Plaintiff advocated for statutory damages and attorneys' fees on this claim until this stage of the litigation.

tangible medium of expression, including a building, architectural plans, or drawings." Under the Copyright Act, the copyright owner has several exclusive rights, including the rights to reproduce, prepare derivative works based upon, and distribute copies of the copyrighted work. 17 U.S.C. § 106. Due to the significance of a copyright, the essential question is who owns the copyright. The parties have raised issues about who owned the architectural plans' copyright at what time. Defendants argue that Seidner initially and solely owned the architectural plans as the copyright author (Dkt. 78; 1:23-25). Furthermore, Defendants argue that he authorized them to copy, display, and use the plans when he owned them (Id.). Plaintiff responds that Seidner did not own the architectural plans in the first place so he could not have intended to grant a license (Dkt. 87, 6:15-17). While Plaintiff questions the relevance of the definitions of "author" and "copyright ownership" (PSOF ¶ 9), the Court finds these terms are at issue. As such, the Court will first address the issue of who was the author and initial owner of the copyright for the architectural plans.

**A.    Copyright Ownership**

Generally, copyright protection vests initially in the "author" of the architectural plans or designs, unless there is a written agreement to the contrary or the work is a "work for hire." 17 U.S.C. § 201(a); see S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 (9th Cir. 1989). Many interested parties, such as the client, the developer, the engineer, and the ultimate inhabitants of a project, may have a voice in the design process. Raphael Winick, Copyright Protection for Architecture After the Architectural Works Copyright Protection Act of 1990, 41 Duke L.J. 1598, 1640 (1992). Although all of these parties may have played some part in the design, only in unusual circumstances will someone other than the architect be the author, the one to give spatial expression to the design ideas. Id. "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (citing 17 U.S.C. § 102). By definition, the author is usually the architect.

1    The Copyright Act also recognizes "joint work," which is defined as "work prepared
2    by two or more authors with the intention that their contributions be merged into inseparable
3    or interdependent parts of a unitary whole."  17 U.S.C. § 101.  However, the cases establish
4    that normal client participation does not transform a client into an author or joint author of
5    an architectural work.  Winick, supra, at 1644-45.  "The owner's general assistance and
6    contributions to the fund of knowledge of the author [do] not make [him] a creator of any
7    original work, nor even the co-author."  S.O.S., Inc., 886 F.2d at 1087 (internal quotation
8    omitted).  When an owner explains to an architect "the type and functions of a building the
9    architect is to design for the owner[,] [t]he architectural drawings are not co-authored by the
10   owner, no matter how detailed the ideas and limitations expressed by the owner."  Id.
11        Here, Fairview alleges it provided a sketch of the custom home design to architect
12   Seidner (PSOF ¶ 87).  Although Fairview may have played some part in the design, Fairview
13   has not shown any unusual circumstances that would make it the author of the architectural
14   plans.  Indeed, Plaintiffs concede that Seidner "transformed the sketch into working
15   construction documents that became the Plans" (Id.).  In other words, Seidner was the author
16   - the person who translated an idea into a fixed, tangible medium of expression entitled to
17   copyright protection.  See 17 U.S.C. § 102.  In addition, Fairview has shown no evidence that
18   it and Seidner intended their contributions merged into inseparable parts of a unitary
19   whole as joint authors.  See 17 U.S.C. § 101.  Furthermore, even if Petracca and Katzin
20   supplied or described the idea, "[a] person who merely describes to an author what the
21   commissioned work should do or look like is not a joint author for purposes of the Copyright
22   Act."  S.O.S., Inc., 886 F.2d at 1087.  Moreover, when Fairview registered the copyright, it
23   listed Seidner as the only author of the architectural plans (Dkt. 79, Ex. F, U.S. Copyright
24   Office Certificate of Registration).  See 17 U.S.C. § 410(c) (a certificate of registration is to
25   "constitute prima facie evidence of the validity of the copyright and of the facts stated in the
26   certificate").  Therefore, unless there was a written agreement to the contrary or the plans
27   were a "work for hire," copyright protection only extended initially to Seidner as the author
28   of the plans.

### 1. Written Agreement

Plaintiff has not presented any evidence of an express written agreement demonstrating that Seidner was not the initial owner of the copyright. Plaintiff alleges that it paid over $25,000 to Seidner for the architectural plans, including the copyrights in the plans, which was in accord with Seidner's custom and practice (PSOF ¶ 88). However, "[t]he custom of the architectural profession is for the architect, and not the client, to retain ownership in the drawings and plans prepared." Winick, supra, at 1643. A written agreement "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price." Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990).

While Plaintiff alleges that Seidner never owned the architectural plans (Dkt. 87, 5:6), the parties never discussed copyright ownership (Dkt. 79, Ex. E., Dep. of Mark Seidner 22:1-28:6). In letters from Seidner to Petracca, Seidner enumerated what was included in his offer of architectural services (Dkt. 79, Letters dated May 29, 2001 and June 18, 2001 Letters, Exs. to Ex. C, Dep. of Christa Petracca). Seidner intended for his June 18, 2001 letter to cover all the terms and conditions between Petracca and him (Dkt. 79, Ex. E, Dep. of Mark Seidner 28:4-6). Invoices reflect the services that Seidner rendered, which are aligned with Seidner's offer (Dkt. 88, Invoices dated July 23, 2001, October 4, 2001, and May 7, 2002, Exs. to Ex. 3, Dep. of Christa Petracca). None of these writings addressed the subject of copyright ownership.

Plaintiff presents evidence of Seidner's testimony that he did not claim ownership over the plans and after he received payment from Fairview, he believed the plans were the property of Fairview (PSOF ¶¶ 16, 46) (Dkt. 88, Ex. 4, Dep. of Mark Seidner 18:6-19:22, 26:12-22) ("And as far as that is concerned, I claim no ownership of the plans. I merely, what I consider, providing [sic] a technical service"). At the same time, Seidner testified that when he previously used the American Institute of Architects's (AIA) standard contracts, he understood "the architect is providing a service, a professional service, and that he has

ownership of the documents, the architect does" (Dkt. 79, Ex. E., Dep. of Mark Seidner 15:8-17).   Seidner also testified that he did not have any understanding of copyright laws (Id. 19:25-20:2).   At best, Seidner's conflicting testimony reflects a lack of knowledge, understanding, or experience about copyrights.   While Seidner apparently did not understand his copyright rights, Plaintiff has not produced an express written agreement demonstrating that the parties understood that Seidner had no copyright ownership as the author of the plans.   See Effects Assocs., 908 F.2d at 557 (written agreement "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price").

Furthermore, Seidner later went through the process of transferring "whatever ownership interests he may have had" to Fairview through an Assignment Agreement, thus demonstrating that Seidner and/or Fairview believed he had ownership rights in the first place (Dkt. 88, Ex. 3, Dep. of Christa Petracca 112:8).   Plaintiff alleges that Seidner believed he never owned the plans (PSOF ¶ 64).   Rather ironically, Plaintiff alleges he merely executed the Assignment Agreement to satisfy legal requirements and clarify ownership (Id. ¶ 76).   The Assignment Agreement signed by Seidner on August 10, 2006 states that "Architect [Seidner] desires to assign *all ownership rights*, together with all use rights, in the Building Plans drafted by Architect . . . Architect hereby assigns to Fairview all ownership and use rights in the Building Plans referenced above" (DSOF ¶ 64; Dkt. 79, Assignment Agreement, Ex. attached to Ex. B, Dep. of David Katzin) (emphasis added).   Moreover, when Fairview registered the copyright, it stated that it obtained ownership of the copyright "by written assignment" (Dkt. 79, Ex. F).   See 17 U.S.C. § 410(c) (a certificate of registration is to "constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate").

In sum, Plaintiff has not produced an express written agreement setting forth that Seidner was not initially entitled to the copyright.   The only written agreement produced demonstrates that Seidner transferred his ownership rights on August 10, 2006, which is after

1  the alleged infringement occurred.  The law is clear about the importance of a written

2  agreement.  <u>See</u> <u>Effects Assocs.</u>, 908 F.2d at 557.  Absent an express written agreement

3  setting forth that Seidner was not the copyright owner, Seidner was entitled initially to

4  copyright ownership and protection as the author of the architectural plans.  Therefore,

5  Plaintiff can only show it was entitled to the copyright by showing that Seidner's

6  architectural plans were a "work for hire."

7         **2.**       **Works for Hire**

8        If the architectural plans are considered a "work for hire," then copyright protection

9  may not extend to the author of the architectural plans.  When architectural plans are a "work

10  for hire," the employer or other person for whom the work is prepared is considered the

11  author and owner of the copyright, unless the parties have expressly agreed otherwise in a

12  signed written agreement.  17 U.S.C. § 201(b).  The applicable part of Section 101 defines

13  a "work made for hire" as "a work prepared by an employee within the scope of his or her

14  employment."  17 U.S.C. § 101.  Generally, architects hired by clients for individual projects

15  will usually not be considered to have produced "works for hire."  Winick, <u>supra</u>, at 1642.

16        "To determine whether a work is for hire under the Act, a court first should ascertain,

17  using principles of general common law of agency, whether the work was prepared by an

18  employee or an independent contractor."  <u>Reid</u>, 490 U.S. at 750-51.  In determining whether

19  a hired party is an employee, the court considers "the hiring party's right to control the

20  manner and means by which the product is accomplished."  <u>Id.</u> at 751.  The court can

21  consider any of these nondeterminative factors:  1) the source of the instrumentalities and

22  tools; 2) the location of the work, 3) the duration of the parties' relationship, 4) whether the

23  hiring party has the right to assign additional projects to the hired party; 5) the extent of the

24  hired party's discretion over when and how long to work; 6) the method of payment; 7) the

25  hired party's role in hiring and paying assistants; 8) whether the work is part of the regular

26  business of the hiring party; 9) whether the hiring party is in business; 10) the provision of

27  employee benefits; and 11) the tax treatment of the hired party.  <u>Id.</u> at 751-52.

28

1    As architect Mark Seidner was not an employee of Plaintiffs but an independent

2  contractor, the architectural plans were not a work for hire.  Although Fairview provided a

3  sketch of the custom home design to Seidner, the extent of control Fairview exercised over

4  the details of the architectural plans is not dispositive.  See id., 490 U.S. at 752.  Indeed, all

5  the other circumstances weigh heavily against finding an employment relationship.  See id.

6  Seidner is an architect, a skilled occupation.  Seidner supplied his own tools and worked in

7  his own office attached to his home (Dkt. 79, Ex. E., Dep. of Mark Seidner 8:13-22).

8  Fairview retained Seidner's services for less than a year, a relatively short period of time

9  (Dkt. 79, Letters dated May 29, 2001 and June 18, 2001, Exs. to Ex. C, Dep. of Christa

10 Petracca; Dkt. 88, Invoices dated July 23, 2001, October 4, 2001, and May 7, 2002, Exs. to

11 Ex. 3, Dep. of Christa Petracca).  During and after this time, Fairview had no right to assign

12 additional projects to Seidner.  Seidner had absolute freedom to decide when and how long

13 to work.  Fairview paid Seidner $25,000, a sum dependent on "completion of a specific job,

14 a method by which independent contractors are often compensated."  See Reid, 490 U.S. at

15 753 (quoting Holt v. Winpisinger, 811 F.2d 1532, 1540 (D.C. Cir. 1987)).  Fairview does not

16 create architectural plans as part of its regular business.  Importantly, Fairview did not

17 designate Seidner's contribution to the work as a "work made for hire" on the Certificate of

18 Copyright Registration (Dkt. 79, Ex. F).  See 17 U.S.C. § 410(c) (a certificate of registration

19 is to "constitute prima facie evidence of the validity of the copyright and of the facts stated

20 in the certificate").

21    As a matter of law, Seidner initially owned the copyright of the architectural plans as

22 the author.  Fairview has produced no evidence of an express agreement clearly setting forth

23 that Seidner did not initially own the copyright.  In addition, Fairview has not shown that

24 Seidner created the architectural plans as a work for hire.  Because architect Seidner is the

25 author of the architectural plans, he was the original and sole owner of the copyright.

26 Fairview has not demonstrated that it was otherwise initially entitled to the copyright.

27 ///

28 ///

1

**B.     Assignments and Transfers of Copyright**

2       Although copyright protection generally only extends to the architect as the copyright
3  owner, an architect can assign or otherwise transfer all or part of his ownership in a
4  copyright.   17 U.S.C. § 201(d).   Any assignment or conveyance must be in writing and
5  signed by the owner.   17 U.S.C. § 204(a) (1988).

6       **1.     Seidner's Assignment or Transfer of His Rights**

7       On August 10, 2006, Seidner executed an Assignment Agreement by which he
8  assigned to Fairview "all ownership and use rights" in the architectural plans (DSOF ¶ 64).
9  While the Court has found that Seidner originally owned the copyright to the architectural
10 plans, he then assigned to Fairview all of his ownership rights in the copyright through a
11 signed writing on August 10, 2006.  As noted, Plaintiffs David Katzin and Christa Petracca
12 concede that they are not the copyright owners.   Therefore, Fairview is currently the sole
13 copyright owner.

14      Defendants have not raised the issue of whether Fairview may sue for an accrued
15 claim of infringement before it became the copyright owner, or in other words, whether
16 Seidner transferred the cause of action along with the copyright to Fairview.   In Silvers v.
17 Sony Pictures Entertainment, Inc., 402 F.3d 881 (9th Cir. 2005), the Ninth Circuit held that
18 a copyright assignee who held an accrued claim for copyright infringement, but who had no
19 legal or beneficial interest in the underlying copyright itself, could not institute an action for
20 infringement.   The Ninth Circuit recognized, though, that after a copyright holder sells a
21 copyright, the new owner may pursue a cause of action that accrued *before* purchase, as long
22 as the copyright seller transferred the cause of action along with the copyright.   Id. at 890 n.
23 1, 891.   Defendants allege that the Assignment Agreement between Seidner and Fairview
24 made no mention of accrued causes of action (DSOF ¶ 64).   However, Defendants only argue
25 that Plaintiffs Katzin and Petracca do not have a claim under Silvers (Dkt. 78, 8:17-9:7).   As
26 Defendants do not raise any issue regarding Fairview's right to an accrued action, the Court
27 will not address such issue.   Now, the issue becomes whether any copyright infringement

28

1   occurred.  More specifically, whether Seidner granted a valid license to Schmid when he

2   owned the copyright before he transferred it to Fairview.

3           **2.     Whether Seidner Granted a Valid License**

4           As noted, a copyright owner can make a "transfer of copyright ownership" so long as

5   it is in writing and signed by the owner.  17 U.S.C. § 204(a).  A transfer of ownership

6   includes an exclusive license, or in other words, the conveyance of any of the exclusive

7   rights comprised in a copyright.  17 U.S.C. § 101.  Those exclusive rights include these

8   rights:  the right to reproduce the copyrighted work, to prepare derivative works based upon

9   the copyrighted work, and to distribute copies of the copyrighted work to the public.  17

10  U.S.C. § 106(1)-(3). While Section 101 defines transfers of ownership broadly, it expressly

11  removes from the scope of Section 204 a "nonexclusive license." <u>Effects Assocs.</u>, 908 F.2d

12  at 558.  While an outright transfer of ownership or exclusive license must be in writing, a

13  nonexclusive license may be granted orally or even by implication from conduct. <u>Id.</u> (citing

14  3 M. Nimmer & D. Nimmer, <u>Nimmer on Copyright</u> § 10.03[A], at 10-36 (1989)).  A license

15  is an affirmative defense to infringement.  <u>Oddo v. Ries</u>, 743 F.2d 630, 634 n. 6 (9th Cir.

16  1984) (citing 3 M. Nimmer, <u>Nimmer on Copyright</u> § 13.04 (1983)).

17          Defendants argue that when Seidner was the copyright owner, he authorized

18  Defendants to use the architectural drawings so that they have no liability for any alleged

19  infringement (Dkt. 78, 1:23-25).  On May 4, 2005, Schmid wrote a letter to Seidner stating

20  that he had entered a purchase contract for the property, he would like to use the architectural

21  plans, and the Town of Paradise Valley required a letter from Seidner authorizing the use of

22  the calculations and plans before they would issue a building permit to him (Dkt. 79, Letter

23  dated May 4, 2005, Ex. to Ex. E., Dep. of Mark Seidner).  Schmid also enclosed a sample

24  letter for Seidner to address to the Town of Paradise Valley, which Seidner modified and

25  approved (DSOF ¶ 17-18).  In addition to the modified sample letter, Seidner authored a

26  letter to Schmid on May 10, 2005 (<u>Id.</u> ¶ 18).  Defendants maintain that Seidner expressly

27  authorized Schmid and Aztex to use the architectural plans through this May 10, 2005

28  writing (Dkt. 78, 2:15-3:17).  The letter reads as follows:

This letter is to confirm that I have provided architectural design services including plans, construction documents and other related information to Christa and David Katzin for a custom residence located at Lot 8, Stanford Court, in the Town of Paradise Valley.

I understand that you have entered into a purchase contract to acquire the referenced property.

Upon your settlement of this transaction, you have my authorization to use these construction documents prepared by me. I will be more than willing to provide you with any design services, previous information or clarifications through the completion of this project.

(Dkt. 79, Letter dated May 10, 2005, Ex. to Ex. E, Dep. of Mark Seidner). Therefore, Defendants argue that Seidner's license presents a complete defense to a claim of copyright infringement (Dkt. 78, 2:23-24).

Defendants also argue that not only did Seidner give Defendants an express written license, he also sent the architectural plans without any limitation, which reflects an implied license to use the plans consistent with his May 10, 2005 letter (Dkt. 78, 2:22-23, 3:16-17; Dkt. 94, 4:3-11). "While delivery of a copy of a work 'does not of *itself* convey any rights in the copyrighted work,' 17 U.S.C. § 202 (1988) (emphasis added), it is one factor that may be relied upon in determining that an implied license has been granted." Effects Assocs., 908 F.2d at 559 n. 6. According to Defendants, Seidner e-mailed an electronic copy of the plans to Schmid without any limitations or conditions (Dkt. 79, Ex. L, Aff. of David Schmid ¶¶ 5-6 and Ex. A). Plaintiff disputes this fact because Seidner testified that he had no recollection of sending the plans to Schmid via email (PSOF ¶ 19). The Court does not have to rely on inconclusive recollections. In fact, Defendants have submitted hard copies printed from the electronic copies of the plans that Seidner sent to Schmid by e-mail (Dkt. 79, Ex. A to Ex. L, Aff. of David Schmid). Regardless of whether Seidner granted an implied license by emailing Schmid the architectural plans, Seidner granted Defendants an express license by his May 10, 2005 letter.

With regards to the May 10, 2005 letter, Plaintiff argues that Seidner believed he was merely providing Schmid with a "transfer" letter that would satisfy the Town of Paradise Valley requirements for transferring a building permit application (Dkt. 87, 5:7-10).

However, Seidner testified that he viewed the letter as something more than a "transfer" letter. Seidner testified:

> Basically, it was, the $2500 the way I understood it was he would pay me $2500 to write a letter to the Town of Paradise Valley to obtain a building permit which therefore would be *the use of the plans* . . . [the letter] was so he could pick up the building permit and use the plans. Once you pick up the building permit, you get a set of approved plans from stamped by the City, and he would have a complete set of plans, approved plans that he could make copies of all he wanted to give to his subs, this type of thing. So by transferring the permit, in essence, he gets the plans when he picks up the permit.

(Dkt. 88, Ex. 4, Dep. of Mark Seidner 57:3-19) (emphasis added). The agreement was for Seidner to help Schmid obtain a permit from the Town of Paradise Valley, and nowhere does Seidner state that after the town granted its approval, Seidner would need to obtain Seidner's permission before commencing work. See Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 828-29 (9th Cir. 2001) (finding an implied license to use, reproduce, adapt, and publish a revised plot plan to build a project). As noted, Seidner's May 10, 2005 letter to Schmid stated, "you have my authorization to use these construction documents prepared by me. I will be more than willing to provide you with any design services, previous information or clarifications through the completion of this project" (Dkt. 79, Letter dated May 10, 2005, Ex. to Ex. E, Dep. of Mark Seidner). As evidenced by this letter, Seidner's express language and willingness to work with Schmid in order to develop the custom home constituted an express license to use the plans "through the completion of this project" (See id.). Thus, Seidner unequivocally granted Schmid permission to complete the project using the architectural plans.

Furthermore, Defendants did not need to pay the $2,500 in order for the license to exist. Courts do not construe payment in full as a condition precedent to implying a license; conditions precedent are generally disfavored and will not be read into a contract unless they are required by plain, unambiguous language. Effects Assocs., 908 F.2d at 559 n. 7 (citing Sulmeyer v. United States (In re Bubble Up Delaware, Inc.), 684 F.2d 1259, 1264 (9th Cir.1982)). Seidner's May 10, 2005 letter to Schmid does not support a conclusion that full payment was a condition precedent to Schmid's use of the architectural plans. See id.

1    Moreover, Seidner never indicated to Schmid that a failure to pay would be viewed as

2    copyright infringement.  See id.  Rather, in his letter Seidner referenced Schmid's purchase

3    contract to acquire the property, and then he stated that upon settlement of this transaction,

4    Schmid would have Seidner's authorization to use the architectural plans.

5        The Court finds that Seidner granted Schmid an express license through his May 10,

6    2005 writing.  When Schmid assigned the property to Aztex, he also assigned the license.

7        **2.    Whether Schmid Failed to Disclose Material Information that Invalidates**

8            **the License**

9        Plaintiff claims that Schmid's non-disclosure amounts to misrepresentation and

10   precludes any formation of a license agreement (Dkt. 87, 8:7-8).  Specifically, Plaintiff

11   alleges that Schmid did not tell architect Seidner that he was offered, but refused to purchase,

12   the plans from the joint venture (PSOF ¶ 95).  Citing a long list of Arizona cases, Plaintiff

13   asserts that Schmid had a duty to disclose material information (Dkt. 87, 8:13-9:13).

14       In an arm's length transaction, generally no duty to disclose exists between a buyer

15   and seller under Arizona law, but certain circumstances may give rise to such a duty.

16   Universal Inv. Co. v. Sahara Motor Inn, Inc., 127 Ariz. 213, 215, 619 P.2d 485, 487 (Ct.

17   App. 1980).  A buyer and seller have legal duties to each other arising out of their contractual

18   relationship, including the duty to disclose facts that are material to the transaction.

19   Lombardo v. Albu, 199 Ariz. 97, 99, 14 P.3d 288, 290 (2000) (citing Restatement (Second)

20   of Contracts § 161 (1981); Restatement (Second) of Torts § 551 (1977)).  When a seller

21   knows that material facts affecting the value of property are unknown to the buyer, the seller

22   has a legal duty to disclose such facts.  Id. (citing Hill v. Jones, 151 Ariz. 81, 84-85, 725 P.2d

23   1115, 1118-19 (Ct. App. 1986)).  A buyer may also have a duty to disclose, hence the duties

24   are not a one-way street.  Id.  The court has found that because the major consideration

25   flowing from buyer to seller is the price, a buyer has a duty to disclose to the seller facts

26   critical to the buyer's ability to perform the transaction.  See id.; see also Wells Fargo Bank

27   v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund, 201

28   Ariz. 474, 485, 38 P.3d 12, 23 (2002).

1   While Plaintiff discusses at length the duty to disclose material information, the

2 nondisclosure of which equates to a misrepresentation, Plaintiff has not shown that Schmid

3 owed a duty to Seidner to disclose that the joint venture offered to sell him the plans.  In

4 addition, Plaintiff has not shown that the information was material.  First, in this case,

5 Schmid was the "buyer" in this transaction.  All of Plaintiff's cited cases relate to the seller's

6 duty to disclose (See Dkt. 87, 8:13-9:13).  While Schmid as the buyer may have had a duty

7 to disclose his ability to perform the transaction, he did not have a duty to disclose that

8 another party had offered a higher selling price.  See Lombardo, 199 Ariz. at 99, 14 P.3d at

9 290.

10   Second, Schmid believed that Petracca and Katzin did not in fact own the plans, but

11 rather Seidner as the architect owned them (DSOF ¶ 15; Dkt. 79, Ex. A, Dep. of David

12 Schmid 93:17-94:21; see Dkt. 79, Email dated June 6, 2006, Ex. to Ex. L, Aff. of David

13 Schmid).  The joint venture had offered to sell the plans to Schmid for $50,000, twice the

14 amount it paid for Seidner's architectural services (PSOF ¶¶ 88, 92).  After the sale closed,

15 Defendants allege that the joint venture instructed the title company to pay $100,000 from

16 the sale to Fairview for developing the land, including the architectural plans (DSOF ¶ 22).

17 The Court does not speculate whether the joint venture built in all of the costs expended to

18 develop the property up until the time of sale, including the architectural plans, into its selling

19 price of $1.2 million.  In any event, Schmid went to the proper copyright owner in order to

20 seek authorization to use the architectural plans.  Given the Court's finding that Seidner was

21 indeed the author and copyright owner, Schmid's action was proper.  Even if Schmid thought

22 that Petracca and Katzin were joint authors and co-owners of the copyrighted plans, Schmid

23 is entitled to "shop around" with another "seller" of the plans.

24   Moreover, because the joint venture was not the legal copyright owner of and could

25 not license the plans to Schmid, the information that it tried to sell the plans to Schmid was

26 immaterial to Schmid's transaction with Seidner.  As Schmid did not owe a duty to Seidner

27 to disclose this kind of information and the information was not material, Schmid did not

28 make any misrepresentations that would invalidate the license.

**3.     Whether Seidner Had the Right to and Properly Rescinded the License**

Under Section 203 of the Copyright Act, licensing agreements are not terminable at will from the moment of creation; instead, they are terminable at the will of the author only during a five year period beginning at the end of thirty-five years from the date of execution of the license unless they explicitly specify an earlier termination date. 17 U.S.C. § 203(a). Section 203 applies to non-exclusive, as well as exclusive, licenses executed by the author on or after January 1, 1978. 17 U.S.C. § 203(a).

Generally, courts rely on state law to fill in the gaps that Congress leaves in federal statutes. Foad, 270 F.3d at 827 (citation omitted). Thus, where the Copyright Act does not address an issue, courts turn to state law to resolve the matter, so long as state law does not otherwise conflict with the Copyright Act. Id. (citations omitted). "Although licensing agreements are not terminable at will, under federal and state law a material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement." Rano v. Sipa Press, Inc., 987 F.2d 580, 586 (9th Cir. 1993) (citing Costello Publ'g Co. v. Rotelle, 670 F.2d 1035, 1045 (D.C. Cir. 1981); 3 Nimmer § 10.15[A] at 112). Even if there are grounds to rescind under Arizona law that are not in direct conflict with federal law, a notice of rescission must be clear and unambiguous, conveying the unquestionable purpose to terminate a contract. Miller v. Crouse, 19 Ariz. App. 268, 273, 506 P.2d 659, 664 (Ct. App. 1973) (citing Mahurin v. Schmeck, 95 Ariz. 333, 390 P.2d 576 (1964); 17 Am. Jur. 2d Contracts § 509 (1964)). When the conduct of a person who has a right to rescind is not clear, he will be deemed not to have rescinded. Id.

Furthermore, a person rescinding a contract must do so within a reasonable time under the existing circumstances in stating an intent to rescind. Mahurin, 95 Ariz. at 340, 390 P.2d at 580; Smith v. Hurley, 121 Ariz. 164, 169, 589 P.2d 38, 43 (Ct. App. 1978). What is a reasonable time in which to communicate an intention to rescind is a question of fact "unless the facts are such that only one inference could be derived therefrom in which case it would become a question of law." Mahurin, 95 Ariz. at 340, 390 P.2d at 580. Moreover, if a party waives the timely performance provisions of a contract as to when payments must be made,

1    the party can only forfeit the contract after giving notice and a reasonable opportunity to

2    perform.  Ariz. Title Guarantee & Trust Co. v. Modern Homes, Inc., 84 Ariz. 399, 403, 330

3    P.2d 113, 115 (1958); Miller, 19 Ariz. App. at 273, 506 P.2d at 664; Found. Dev. Corp. v.

4    Loehmann's, Inc., 163 Ariz. 438, 450, 788 P.2d 1189, 1201 (1990) (holding that a time of

5    the essence provision is merely one factor to be considered when determining if a breach is

6    material).

7         Plaintiff attempts to create a question of fact by alleging Defendants committed a

8    material breach giving rise to a right of rescission.  In his rescission letter, Seidner stated that

9    because of Schmid's alleged misrepresentation and non-payment of the $2,500, he was

10   rescinding his permission to use the architectural plans (Dkt. 79, Letter dated August 9, 2006,

11   Ex. to Ex. E, Dep. of Mark Seidner).  When Petracca contacted Seidner on or about April 19,

12   2006, Petracca informed Seidner that Schmid/Aztex had not purchased the plans from the

13   joint venture (PSOF ¶ 30).  Petracca incorrectly believed that only the joint venture was

14   entitled to sell the plans to Schmid, which she communicated to Seidner.  This conversation

15   led Seidner to believe that Schmid had made material misrepresentations to him (See id.).

16   As the Court has found that Schmid made no material misrepresentations, Seidner may not

17   have had a right to rescind based on this ground.  On the other hand, the non-payment of the

18   $2,500 is a closer call and may have been a material breach of the licensing agreement.

19   Although the issue of whether Seidner had a right to rescind because the breach was material

20   may be a question of fact, Seidner's failure to properly rescind renders this discussion moot.

21        Seidner's May 10, 2005 letter did not include any time of the essence provisions, nor

22   did the letter state anything about when the $2,500 should be paid.  Seidner only addressed

23   time periods in two statements.  He authorized Schmid to use the plans upon the settlement

24   of the purchase contract for the property, and he offered his services "through the completion

25   of this project" (Dkt. 79, Letter dated May 10, 2005, Ex. to Ex. E, Dep. of Mark Seidner).

26   It is unclear when Seidner expected the $2,500 payment, and arguments can be made that

27   Seidner and Schmid expected to exchange the payment after the purchase contract closed,

28   after the project was completed because Seidner offered his continued service, or sometime

in between.  In late 2005 or early 2006, Seidner spoke with Melinda Chipley of Chipley Luxury Homes ("Chipley"), which served as the construction manager (DSOF ¶¶ 27, 30). He told her that he had not yet received payment, and Chipley should be careful (Id. ¶ 30). However, he did not tell Chipley that it or Aztex could not use the plans (Id.).  In August 2006 before the project was completed, Five Star Development, who Seidner associated with Schmid, sent the $2,500 payment to Seidner (Id. ¶ 62; Dkt. 78, 6:17-18).  If the payment should have been made after the purchase contract closed, Seidner may have waived timely performance, and therefore he could only terminate the contract after giving notice and a reasonable opportunity to perform.  See Miller, 19 Ariz. App. at 273, 506 P.2d at 664.  From June 16, 2005 through August 2006, Seidner had no communication with Schmid or Aztex (DSOF ¶ 64).  On the other hand, if Defendants did not need to make the $2,500 payment until the project was completed, then they were not in breach by sending payment while construction was still ongoing.

Even assuming that Defendants committed a material breach, Seidner did not notify Schmid of his rescission of the license until a letter dated August 9, 2006 when he returned the $2,500 payment and an unopened letter (Dkt. 79, Ex. to Ex. E, Dep. of Mark Seidner). What constitutes a reasonable time in which to communicate an intention to rescind is a question of fact "unless the facts are such that only one inference could be derived therefrom in which case it would become a question of law."  Mahurin, 95 Ariz. at 340, 390 P.2d at 580.  The Town of Paradise Valley issued building permits in 2005 after Seidner sent his May 10, 2005 authorization letter (DSOF ¶¶ 17-18, 25-26).  During the rest of 2005, Defendants moved forward with the project under a valid license (Id. ¶¶ 27-30).  Defendants began construction in February 2006 (Id. ¶ 31).  Then, in response to the misleading conversation with Petracca, Seidner sent a letter to her in April 2006 stating his intention to rescind the license, but he did not communicate this intent to Schmid or Aztex (Dkt. 79, Letter dated April 21, 2006, Ex. to Ex. B, Dep. of David Katzin) ("I therefore rescind my permission to David Schmid, Aztex Custom Home Builders, LLC, or Chipley Construction to use these design and const. documents and hereby reject David Schmid's offer of

1    $2,500"). This letter is addressed to Petracca, but not to Schmid, and Plaintiff has not

2    produced any evidence that Seidner also sent this letter to Schmid. Plaintiff argues that

3    Seidner intended for Fairview to communicate his rescission to Schmid, which Fairview's

4    counsel did not communicate to Schmid until June 2006 (PSOF ¶ 46). See Miller, 19 Ariz.

5    App. at 273, 506 P.2d at 664 (noting that a notice of rescission is not effective until it is

6    received and unless the party is entitled to rescind). The fact remains undisputed, though,

7    that Seidner himself did not state his intent to rescind to Schmid or Aztex in April 2006. See

8    Rano, 987 F.2d at 586 (noting that Rano clearly attempted to rescind the agreement at issue);

9    Fosson v. Palace (Waterland), Ltd., 78 F.3d 1448, 1455 (9th Cir. 1996). Because Seidner's

10   conduct was not clear, he is not deemed to have rescinded in April 2006. See Miller, 19

11   Ariz. App. at 273, 506 P.2d at 664.

12          Not until Seidner's August 9, 2006 letter did he state to Schmid, "I therefore rescind

13   my permission for you, Aztec [sic] Custom Home Builders, LLC., [sic] Five Star

14   Development or Chipley Construction to use these design and construction documents and

15   hereby reject your offer of $2,500 to transfer the use of these documents for your use on the

16   above referenced property" (Dkt. 79, Ex. to Ex. E, Dep. of Mark Seidner). Plaintiff has not

17   presented any evidence demonstrating that Seidner notified Schmid of his intent to rescind

18   the license earlier than August 2006. The facts are clear that while Seidner intended to

19   rescind as early as April 2006, he did not communicate his rescission to Schmid until August

20   2006. By August 2006, Defendants had completed several phases of construction and passed

21   inspections required by the Town of Paradise Valley (DSOF ¶¶ 32-63). Furthermore, Aztex

22   had incurred over $617,000 for construction work (Id.). Seidner knew that construction was

23   ongoing (DSOF ¶¶ 39, 43). Seidner rescinded nearly 15 months after he sent his May 10,

24   2005 authorization letter, nearly 4 months after he formed his intent to rescind, and after

25   several phases of construction had been completed. As "the facts are such that only one

26   inference could be derived therefrom," the Court finds as a matter of law that Seidner did not

27   rescind the license within a reasonable time. Mahurin, 95 Ariz. at 340, 390 P.2d at 580.

28

As noted, there is some question over whether Seidner was even entitled to rescind. Seidner may have waived timely payment so that he could only terminate the contract if he provided notice and an opportunity to cure, or the August 2006 payment may not have been a material breach in the first place. Even if Seidner was entitled to rescind, the Court has found that Seidner's rescission by the August 9, 2006 letter was unreasonable.

In sum, this case highlights the importance of signed writings in the law. Absent a written agreement regarding initial copyright ownership between Seidner and his clients, Seidner owned the copyright as the author. Seidner then expressly granted a license to use the architectural plans to Schmid through a signed writing, the May 10, 2005 letter. Over a year later on August 9, 2006, Seidner stated his intent to rescind in a letter to Schmid. After this, Seidner transferred his copyright to Fairview by signing an Assignment Agreement. The writings speak for themselves, and the Court has based its findings solely on the writings. The Court does not find Defendants liable to Fairview for copyright infringement because Seidner granted Defendants a license when he owned the copyright. Therefore, the Court will grant summary judgment in favor of Defendants.

To this day, Seidner does not appear to have received payment pursuant to the agreement between Schmid and Seidner. As noted, Seidner returned the $2,500 payment on August 9, 2006, and the next day he assigned the copyright to Fairview. However, Seidner is not without a legal remedy as he may have a claim for the $2,500. While Seidner may have a claim, he is not a party to this lawsuit.

**IV.    Liability of David Schmid**

As the Court has granted summary judgment in favor of Defendants, the Court does not address whether Schmid could have been held liable under a theory of primary or contributory infringement.

**V.    Permanent Injunction**

As the Court has granted summary judgment in favor of Defendants, the Court will not grant a permanent injunction against Defendants. A district court cannot issue an injunction unless the moving party satisfies the court that relief is needed because "there

1   exists some cognizable danger of recurrent violation." <u>United States v. W.T. Grant Co.</u>, 345

2   U.S. 629, 633 (1953).   The determination that such danger exists must be "based on

3   appropriate findings supported by the record." <u>Fed. Election Comm'n v. Furgatch</u>, 869 F.2d

4   1256, 1263 (9th Cir.1989); Fed. R. Civ. P. 65(d).   Using the Ninth Circuit's factors,  the

5   district court must make explicit findings from which a finding of a likelihood of future

6   violations could be inferred.   <u>Furgatch</u>, 869 F.2d at 1263; <u>United States v. Laerdal Mfg.</u>

7   <u>Corp.</u>, 73 F.3d 852, 854-855 (9th Cir. 1995) (citing <u>Furgatch</u>, 869 F.2d at 1263, n. 5).  As

8   noted, the Court has not found a violation of copyright here, and the home has already been

9   completed.  In addition, the Court does not find a likelihood of future copyright violations

10  of architectural plans for a 9,000-plus square foot custom home designed for a specific parcel

11  of property in Paradise Valley.   Therefore, Plaintiffs request for a permanent injunction is

12  denied.

13         In light of the reasons above,

14         **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (Dkt.

15  78) is **GRANTED**.  The Clerk of Court is directed to terminate this matter.

16         DATED this 2nd day of March, 2009.

17

18

19                                    _____

                                      Stephen M. McNamee
20                                    United States District Judge

21

22

23

24

25

26

27

28